IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RONNIE WIMBUSH #360-137 | * |
| Plaintiff, | |
| v. | * CIVIL ACTION NO. JKB-12-523 |
| | |
| OFFICER RANDOLPH KEEFER[1] | * |
| OFFICER ZACHARY KIFER | |
| SERGEANT BRIAN MARSH | * |
| WARDEN BOBBY SHEARIN | |
| Defendants | * |

## MEMORANDUM

Ronnie Wimbush, who is incarcerated at the North Branch Correctional Institution (NBCI), seeks money damages and alleges that defendants used excessive force against him in retaliation for a lawsuit Wimbush had filed against prison psychologist Laura Moulden.[2] (ECF No. 1 at 8 (Declaration of Ronnie Wimbush) and ECF No. 1 at 9 (Declaration of Curtis Boulware)). Defendants have submitted a motion for summary judgment (ECF No. 33) and Wimbush has filed an opposition thereto.[3] (ECF No. 39). The court now rules pursuant to Local Rule 105.6 (D. Md. 2011), no hearing being necessary. For the following reasons, defendants' motion for summary judgment will be denied without prejudice and defendant Shearin dismissed from suit.

---

[1] The Clerk shall amend the docket to reflect the full and correct spelling of defendants' names.

[2] Wimbush sued various members of NBCI's psychology department, including Psychologist Laura Booth-Moulden, alleging that they refused to provide him adequate treatment for mental health problems. *See Wimbush v. Moulden, et al.,* Civil Action No. JKB-12-106 (consolidated) (D. Md.). Summary judgment was entered in favor of Booth-Moulden and the other defendants by Memorandum and Order dated June 28, 2012.

[3] Wimbush stated that as of April 8, 2013, he had not been provided an opportunity to view three videos filed in support of defendants' dispositive motion. (ECF No. 54). He reiterates this claim in undated correspondence received by the Clerk on April 22, 2013. (ECF No. 56). Defendants aver that they have complied with court order (see ECF Nos. 36 and 50, p. 3) and provided Wimbush an opportunity to view the videos on April 15, 2013. (ECF No. 55, Declaration of Randy Durst). The court has reviewed the videos. With the exception of the Extraction Team video, the footage, taken by mounted cameras showing a wide expanse of prison tiers, are largely inconclusive and in any event lend no clear support to Wimbush's version of events.

## Background

Wimbush states that "around 8:30 or 9:00" on January 13, 2012, Officers Keefer and Kifer accompanied a nurse to his cell to deliver medication. When Wimbush put his arm outside the door slot to obtain his medication, he was sprayed with Mace. Keefer then cuffed his right wrist and handed the other end of the cuff to Kifer, who pulled Wimbush's arm through the slot, causing injury to Wimbush's wrist and armpit. Keefer and Kifer, accompanied by Sergeant Marsh, then entered the cell. Kifer punched Wimbush in the ribs, and Keefer and Marsh dragged Wimbush out of the cell, rather than allowing him to exit the cell on his own, using his cane. Dr. Ottey treated Wimbush for a cut on the armpit and ordered an x-ray of his ribs. Wimbush alleges that pictures were taken of his injuries.[4]

Defendants present a different version of events. They indicate that Wimbush was involved in three separate altercations with corrections staff during January 12 and 13, 2012,[5] culminating in the alleged assault set out in the complaint. During the first incident on January 12, a correctional officer opened the security slot in Wimbush's cell to give him his morning medications. (ECF No. 33, Ex.1, Declaration of Randy Durst, Attachment A, p. 6). After receiving the medications, Wimbush ignored several direct orders to remove his arm so the slot could be closed, threw feces on the tier, and threatened to throw liquid on staff. The officer

---

[4] Wimbush also complains that on February 10, 2012, Keefer, Kifer and Officer Friend approached his cell, used racial epithets, threatened to kill him and his family after he is released from prison, and stated they were keeping mail from him. (ECF No. 1 at 7). This allegation is unrelated to the alleged assault that forms the basis of the complaint and does not appear to have been presented through the prison Administrative Remedy Procedure (ARP) process. While Wimbush is free to raise this claim as a separate civil rights action, it will be not addressed here.

[5] Although allegations concerning use of force are not at issue in two of the three incidents, information concerning the events has been provided by defendants, presumably to inform the court of the totality of Wimbush's behavior and conduct that culminated in the actions taken by defendants. The court takes notice that after the first incident, Chief of Security Harbaugh placed Wimbush on a 24-hour Staff Alert Designation, indicating Wimbush could pose a threat "to the institution, staff or other inmates." (ECF No. 33, Attachment A, p. 16).

told Wimbush his cell would be searched for weapons and he needed to be placed in hand restraints. Wimbush refused to be handcuffed and a Use of Force /Extraction Team was called in. The team deployed a burst of pepper spray through the open slot and Wimbush was handcuffed. Once inside the cell, officers found two bowls containing urine and feces. Wimbush was brought to the medical unit for evaluation and treatment for pepper spray exposure, provided a shower, and then returned to his cell. *See id.* Wimbush was able to walk despite the absence of his cane, and was supported by two officers as he limped to the medical unit, to the shower, and back to his cell. The extraction, medical examination, body search, and shower are captured on video and confirm defendants' version of events. (ECF No. 55, Tape No. NBCI 12-007).

Neither the officers involved nor Wimbush showed any demonstrable physical injury as a result of the incident. What is apparent is that Wimbush was emotionally distraught, as evidenced by his repetition of a phrase that corrections staff "want to kill [him] to keep [him] from [his] family." The officers dealing with Wimbush seem to recognize his emotional state, and the officer leading the Extraction Team promptly addressed Wimbush's need to decontaminate and receive medical evaluation. No Eighth Amendment violation is apparent with regard to this incident.

The second incident – which also is not the subject of Wimbush's complaint -- began on January 13, 2012, at approximately 1:00 p.m., when Correctional Officer Andrew Grubb approached Wimbush's cell to investigate a loud noise coming from inside. (ECF No. 33, Ex. 1, Attachment B). The officer looked through the cell door window, saw Wimbush kicking his heater, and ordered him to stop. Wimbush continued to kick the heater; shouted at the officer that he was going to kill himself; picked up a piece of loose mortar from his cell floor; threw the mortar in the direction of the officer; and told the officer that he was going to kill him as well,

before he resumed kicking the heater. The officer repeated his order to stop kicking the heater, which Wimbush ignored, and the officer directed a burst of pepper spray through the open security slot. Wimbush then presented his hands for cuffing through the slot, and was escorted to the medical room by five officers.[6] Wimbush was examined by medical staff and spoke with Psychologist Moulden. He was strip-searched, given a shower, security garment, and mattress, and placed under observation due to his comments about harming himself. Again, no Eighth Amendment violation is apparent.

These incidents precede the incident that is the subject of this lawsuit and occurred the same day, January 13, 2012. Defendants state that at approximately 9:00 pm, Officers Keefer and Kifer opened Wimbush's security slot to offer his evening medications. (*See* ECF No. 33, Ex. 1, Attachment C). Wimbush refused to remove his arm to allow the security slot to be closed and demanded to speak with a sergeant regarding a previous infraction. The officers agreed to take Wimbush to speak with someone about the matter, and Kifer was able to place one handcuff on Wimbush. Wimbush refused to allow the other wrist to be cuffed, insisting that a sergeant come to his cell.

Sergeant Marsh was notified of the situation and responded to the tier. Marsh gave Wimbush a direct order to submit to be handcuffed, but Wimbush refused and began pulling Kifer's arm into the cell. After Wimbush refused to comply with a direct order to stop pulling the handcuffs, Marsh deployed a burst of pepper spray through the open security slot, striking Wimbush in the body. Marsh gave Wimbush another order to allow the second handcuff to be applied and Wimbush complied and sat on his bunk. Wimbush's door was opened but he refused to exit his cell, claiming he needed his cane to walk. Marsh, Keefer, and Kifer entered the cell

---

[6] The video provided by defendants shows Wimbush under escort as he was about to enter the medical unit. (ECF No. 55, Tape No. NBCI 12-008).

4

and pulled Wimbush to his feet. Marsh and Kifer escorted Wimbush to the medical area for evaluation by Dr. Colin Ottey. Wimbush's medical record indicates he was seen at 9:04 pm by Dr. Ottey, who noted Wimbush had a contusion of the chest wall and was short of breath. Dr. Ottey treated Wimbush for pepper spray exposure and released him. Wimbush showered to further wash off the pepper spray and was returned to his cell. (ECF No. 33, Ex. C, pp. 13 and 17).

In his opposition response, Wimbush states that he never resisted or attempted to pull Kifer's arm through the slot, and that there was no need for him to be handcuffed, presumably because he needs his hands in order to walk with a cane. (ECF No. 39 at 1-2). The video (ECF No. 55, Tape No. BNCI 12-009) shows three officers at Wimbush's cell door. The images are not distinct; however, they depict one officer pulling back and forth on an object partially outside Wimbush's door slot. Whether Wimbush or the officer initiated the tug-of-war cannot be determined. It appears that pepper spray was administered and within seconds the officers entered the cell and, holding Wimbush's arms, dragged him out of the cell. Wimbush then dropped his full weight onto the officers, who half-dragged and half-carried him off the tier. The last frames of the video taken on the tier show the officers holding onto Wimbush's arms and Wimbush "skiing" down the tier with one leg held in front and one leg, bent at the knee, in contact with the polished floor. The video, taken from great distance, does not contain audio recording, and it is impossible to confirm Wimbush's complaint allegation that at the time Marsh entered Wimbush's cell, Marsh stated that Wimbush should not have filed a lawsuit against Psychologist Moulden. Wimbush and fellow prisoner Curtis Boulware have submitted affidavits suggesting the incident was staged by the officers to punish Wimbush for his lawsuit against Psychologist Moulden. (ECF No. 1, pp. 8-9). Although defendants have submitted signed

reports, none has provided an affidavit refuting Wimbush's allegations concerning the incident occurring the evening of January 13, 2012.

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial. *See Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Further, the court must construe the facts in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *In re Apex Express Corporation*, 190 F.3d 624, 633 (4th Cir. 1999).

A federal court must liberally construe pleadings where, as here, the plaintiff is a self-represented litigant, in order to allow development of potentially meritorious cases. *See Haines v.*

*Kerner*, 404 U.S. 519, 520 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.

## Analysis

The claim against Warden Bobby Shearin is presented based solely upon vicarious liability, otherwise known as respondeat superior. The doctrine of respondeat superior generally is inapplicable to § 1983 suits. An employer or supervisor is not liable for the acts of employees, in the absence of an official policy or custom which results in illegal action. *See Monell v. Department of Social Services*, 436 U.S. 658, 694, (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Wimbush merely claims that Shearin did not respond to his letter concerning the alleged assault. This claim does not implicate a constitutional right, and Wimbush's complaint against Shearin shall be dismissed.

Wimbush's allegations against the officers, however, demand further review. In the prison context, a claim that officials applied excessive force falls under the Cruel and Unusual Punishments Clause of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted). "Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761.

The objective component focuses not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." *Wilkins v. Gaddy*, 591 U.S. 34, 39 (2010). The absence of significant injury alone is not dispositive of a claim of excessive force.

*Id.* The objective component can be met by "the pain itself," even if the prisoner has no "enduring injury." *Williams*, 77 F.3d at 762 (internal quotation marks omitted). Regarding the subjective component, the key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted); see *Shreve*, 535 F.3d at 239. In *Whitley*, the Court outlined factors to consider when deciding if the prison official acted wantonly or maliciously: (1) the necessity for the application of force; (2) the relationship between the need for force and the amount of force used; (3) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them" at the time; and (4) the "efforts made to temper the severity" of the force applied. *Whitley*, 475 U.S. at 321. Wimbush has established the objective component with regard to his claim, based on Dr. Ottey's report that he suffered chest wall bruising and shortness of breath and Officer Marsh's report indicating Marsh was exposed to Wimbush's blood. (ECF No. 33, Attachment C, pp. 8 and 17).

The court lacks sufficient evidence to determine whether Wimbush satisfies the subjective component of his Eighth Amendment claim. Without affidavits from the officers, the undersigned cannot determine whether the officers deliberately "see-sawed" Wimbush's cuffed arm in retaliation for his lawsuit against Moulden, or whether Wimbush failed to comply with the order to stop tugging on the handcuff. In the latter scenario, the use of pepper spray[7] would

---

[7] Use of pepper spray is not a trivial event. *See Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (observing that pepper spray is designed to disable the person sprayed "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (internal quotation marks omitted)), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

not be considered wanton and malicious for the purpose of causing harm.[8] Clearly, Wimbush had acted out repeatedly against corrections staff over a period of two days and it was not unreasonable to conclude that he posed a threat to staff. That earlier misconduct, however, would not, without more, justify automatic use of force based solely on Wimbush's angry demand that he speak to a superior officer to complain about an adjustment ticket.

For these reasons, the court will dismiss defendant Shearin and deny summary judgment without prejudice as to the remaining defendants. A separate order follows.

DATED this 24 day of June, 2013.

BY THE COURT:

James K. Bredar
United States District Judge

---

[8] Although the video does not provide clarity concerning the incident taking place just outside and inside Wimbush's cell, it does demonstrate how Wimbush was removed from the tier once outside his cell. The video strongly supports a conclusion that after removing Wimbush from his cell, the officers tempered the severity of the force applied and promptly took him for medical treatment. From video taken the previous day, it was apparent that Wimbush was able to walk without a cane with some assistance from escorting officers. In the January 13 incident, however, he chose to go completely limp and place his entire weight on the escorting officers. There is no indication that those officers maliciously dragged him to the medical area in a manner designed to cause injury or dropped him on the floor, and no indication that Wimbush sustained any harm to his lower extremities during this unique "carry" across the floor.