FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 DEC 30 P 4: 51

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNIE WIMBUSH #360-137         *
    Plaintiff,

v.                              *   CIVIL ACTION NO. JKB-12-523

OFFICER RANDOLPH KEEFER         *
OFFICER ZACHARY KIFER
SERGEANT BRIAN MARSH            *
    Defendants

## MEMORANDUM

Ronnie Wimbush (hereinafter "plaintiff" or "Wimbush"), who is incarcerated at the North Branch Correctional Institution (hereinafter "NBCI"), sought money damages and alleged that defendants used excessive force against him in retaliation for a lawsuit Wimbush had filed against prison psychologist Laura Moulden.[1] ECF No. 1 at 8 (Declaration of Ronnie Wimbush); ECF No. 1 at 9 (Declaration of Curtis Boulware). On June 25, 2013, the undersigned dismissed plaintiff's claims against NBCI Warden Shearin and otherwise denied without prejudice the summary judgment motion filed on behalf of correctional employees Keefer, Kifer, and Marsh. ECF Nos. 62 and 63. Counsel for defendants have submitted a court-ordered supplemental motion for summary judgment (ECF No. 75) and Wimbush has filed opposition responses thereto,[2] ECF Nos. 78, 79,[3] and 82.[4] The court now rules pursuant to Local Rule 105.6 (D. Md.

---

[1] Wimbush sued various members of NBCI's psychology department, including Psychologist Laura Booth-Moulden, alleging that they refused to provide him adequate treatment for mental health problems. *See Wimbush v. Moulden, et al.*, Civil Action No. JKB-12-106 (consolidated) (D. Md.). Summary judgment was entered in favor of Booth-Moulden and the other defendants by Memorandum and Order dated June 28, 2012.

[2] Plaintiff, a frequent litigator in this court, moves to appoint counsel. ECF Nos. 73, 77 and 84. Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed. *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. District Court*, 490 U.S. 296, 298 (1989). For reasons apparent herein, appointment of counsel shall be granted. The court notes that recently plaintiff was provided a copy of his docket sheet (*see* staff entry of October 23, 2013); accordingly, his motion for such copy work (ECF No. 83) is denied.

2011), no hearing being necessary. For the following reasons, defendants' motion for summary judgment, as supplemented, will be denied and plaintiff's motions for appointment of counsel will be granted.

**Background**

As noted in the Memorandum of June 25, 2013, Wimbush in his complaint states that "around 8:30 or 9:00" on January 13, 2012, Officers Keefer and Kifer accompanied a nurse to his cell to deliver medication. When Wimbush put his arm outside the door slot, he was sprayed with mace. Keefer then cuffed his right wrist and handed the other end of the cuff to Kifer, who pulled Wimbush's arm through the slot, causing injury to Wimbush's wrist and armpit. Keefer and Kifer, accompanied by Sergeant Marsh, then entered the cell. Kifer punched Wimbush in the ribs, and Keefer and Marsh dragged Wimbush out of the cell, rather than allowing him to exit the cell on his own, using his cane. Dr. Ottey treated Wimbush for a cut on the armpit and ordered an x-ray of his ribs because Wimbush had a chest contusion.

Defendants present a different version of events. As the Court noted in the Memorandum of June 25, 2013 (ECF No. 62), Wimbush was involved in separate altercations with corrections staff on January 12 and 13, 2012,[5] culminating in the alleged assault set out in the complaint. As

---

[3] Wimbush complains that on September 22, 2013, library personnel provided him with an extra copy of a pleading in this case which he had not requested. ECF No. 79. Wimbush's claim that this amounted to interference with his legal proceedings and causes him to "fear [for] his safety" (ECF No. 79 at 2) is specious at best. It is impossible to tell whether Wimbush left the pleading(s) in the library or why the pleading(s) were given to him. Such action, however, neither amounts to interference with his right to litigate nor constitutes an activity for which court intervention and protection is required.

[4] Wimbush provides an "affidavit" complaining that on November 12, 2013, various correctional personnel, none of whom are involved in the instant lawsuit, "harassed" him. ECF No. 82. The information contained therein shall not be considered here; plaintiff is, however, free to file a new action against these individuals after completing administrative review of his claims and using court-approved complaint forms available through the Clerk.

[5] Although allegations concerning use of force are not at issue in two of the three incidents, information concerning the events has been provided by defendants, presumably to inform the court of the totality of Wimbush's behavior and conduct that culminated in the actions taken by defendants. The court takes notice that after the first incident,

2

these incidents may be pertinent to disposition of the instant case, they are again outlined here. During the first incident on January 12, a correctional officer opened the security slot in Wimbush's cell to give him his morning medications. ECF No. 33, Ex.1, Declaration of Randy Durst, Attachment A, p. 6. After receiving the medications, Wimbush ignored several direct orders to remove his arm so the slot could be closed, threw feces on the tier, and threatened to throw liquid on staff. The officer told Wimbush his cell would be searched for weapons and he needed to be placed in hand restraints. Wimbush refused to be handcuffed and a Use of Force /Extraction Team was called in. A team member deployed a burst of pepper spray through the open slot and Wimbush submitted to handcuffing. Once inside the cell, officers found two bowls containing urine and feces. Wimbush was brought to the medical unit for evaluation and treatment for pepper spray exposure, provided a shower, and then returned to his cell. *See id.* Wimbush was able to walk despite the absence of his cane, and was supported by two officers as he limped to the medical unit, to the shower, and back to his cell. The extraction, medical examination, body search, and shower are captured on video and confirm defendants' version of events. ECF No. 55, Tape No. NBCI 12-007. More precisely, the video shows Wimbush's transit through various walkways. No video footage was made of the interiors of the medical examination room, the shower, or his cell, nor is there any footage of the body search.

Neither the officers involved nor Wimbush showed any demonstrable physical injury as a result of the incident. What is apparent is that Wimbush was emotionally distraught, as evidenced by his repetition of a phrase that corrections staff "want to kill [him] to keep [him] from his family." The officers dealing with Wimbush seemed to recognize his emotional state, and the officer leading the Extraction Team promptly addressed Wimbush's need to

---

Chief of Security Harbaugh placed Wimbush on a 24-hour Staff Alert Designation, indicating Wimbush could pose a threat "to the institution, staff or other inmates." ECF No. 33, Attachment A, p. 16.

3

decontaminate and receive medical evaluation. No Eighth Amendment violation is apparent with regard to this incident.

The second incident - - which also is not the subject of Wimbush's complaint - - began on January 13, 2012, at approximately 1:00 p.m., when Correctional Officer Andrew Grubb approached Wimbush's cell to investigate a loud noise coming from inside. ECF No. 33, Ex. 1, Attachment B. The officer looked through the cell door window, saw Wimbush kicking his heater, and ordered him to stop. Wimbush continued to kick the heater; shouted at the officer that he was going to kill himself; picked up a piece of loose mortar from his cell floor; threw the mortar in the direction of the officer; and told the officer that he was going to kill him, before he resumed kicking the heater. The officer repeated his order to stop kicking the heater, which Wimbush ignored, and the officer directed a burst of pepper spray through the open security slot. Wimbush then presented his hands for cuffing through the slot, and was escorted to the medical room by five officers.[6] Wimbush was examined by medical staff and spoke with Psychologist Moulden. He was strip-searched, given a shower, security garment, and mattress, and placed under observation due to his comments about harming himself. Again, no Eighth Amendment violation is apparent.

These incidents precede the incident that is the subject of this lawsuit. On January 13, 2012, at approximately 9:00 p.m., Officers Keefer and Kifer opened Wimbush's security slot.[7]

---

[6] The video provided by defendants shows Wimbush under escort as he was about to enter the medical unit. ECF No. 55, Tape No. NBCI 12-008.

[7] Wimbush claims "Nurse Wendy" already had given him medication and that officers do not hand out medications on the tier. ECF No. 78, p. 8. He also claims that much of the video taken of the incident was "scratched" or sanitized to hide the officers' actual conduct. ECF No. 78, pp. 2-3. There is no dispute that the officers were on the tier at about the time the nurse handed out medications. The undersigned has watched the video; while it was produced with a camera from a somewhat distant stationary point and is not of high quality, nothing suggests it was "scratched," erased, or otherwise subjected to editing. The camera used does not appear to have audio recording capability.

4

*See* ECF No. 33, Ex. 1, Attachment C. Wimbush refused to remove his arm to allow the security slot to be closed and demanded to speak with a sergeant regarding a previous infraction. The officers agreed to take Wimbush to speak with someone about the matter, and one officer was able to place one handcuff on Wimbush.[8] At this juncture, the parties' different versions of events become material.

Defendants claim that at this point, Wimbush refused to allow the other wrist to be cuffed, insisting that a sergeant come to his cell. Sergeant Marsh was notified of the situation and responded to the tier. Marsh gave Wimbush a direct order to submit to be handcuffed, but Wimbush refused and began pulling Kifer's arm into the cell. After Wimbush refused to comply with a direct order to stop pulling the handcuffs, Marsh deployed a burst of pepper spray through the open security slot, striking Wimbush in the body. Marsh gave Wimbush another order to allow the second handcuff to be applied and Wimbush complied and sat on his bunk. Wimbush's door was opened but he refused to exit his cell, claiming he needed his cane to walk and cursing the officers. Marsh, Keefer, and Kifer entered the cell and pulled Wimbush to his feet. Marsh and Kifer escorted Wimbush to the medical area for evaluation by Dr. Colin Ottey. During the escort, Wimbush was resistant and on several occasions dropped to the floor. Wimbush's medical record indicates he was seen at 9:04 p.m. by Dr. Ottey, who noted Wimbush had a contusion of the chest wall and was short of breath. Dr. Ottey treated Wimbush for pepper spray exposure and released him. Wimbush showered to further wash off the pepper spray and was returned to his cell. ECF No. 33, Ex. C, pp. 13 and 17 and ECF No. 75, Ex. 1, Attachment A; Ex. 2, Ex. 3, Ex. 4.

---

[8] None of the parties delineates the obvious: NBCI is a maximum security prison, and prisoners on a segregation tier at that facility typically are handcuffed when brought out of their cells for any reason.

In his initial opposition response, Wimbush states that he never resisted or attempted to pull Kifer's arm through the slot, and that there was no need for him to be handcuffed, because he needs his hands in order to walk with a cane. ECF No. 39 at 1-2. The video (ECF No. 55, Tape No. BNCI 12-009) shows three officers at Wimbush's cell door.[9] The images are not distinct; however, they depict one officer pulling back and forth on an object partially outside Wimbush's door slot. Whether Wimbush or the officer initiated the tug-of-war cannot be determined from the video. Wimbush admits, however, that while demanding to see a supervisor and complaining about an adjustment ticket, he had his arm outside the feed slot in order to "express [himself]." ECF No. 78, pp. 8-9. Wimbush states that he asked that the cuff be taken off so he could fetch his cane, at which time Kifer began to "snatch" his arm through the slot. Plaintiff states he was then maced by Keefer (not Marsh), and complied by placing his other arm outside the slot to be cuffed. *Id.*, p. 9. Once cuffed, Wimbush sat on his bed, at which time all three officers entered his cell. The video does not depict what occurred inside the cell. Wimbush claims that Marsh stated that Wimbush should not have filed a lawsuit against Psychologist Moulden, at which point Kifer struck Wimbush in the ribs. ECF No. 78, p. 7. Wimbush and fellow prisoner Curtis Boulware have submitted affidavits suggesting the incident was staged by the officers to punish Wimbush for his lawsuit against Psychologist Moulden. ECF No. 1, pp. 8-9 and ECF No. 78, pp. 8-11.

The video shows that shortly after they entered the cell, two officers, each holding one of Wimbush's arms, dragged him out of the cell. Wimbush then dropped his full weight onto the officers, who half-dragged and half-carried him off the tier. The last frames of the video taken

---

[9] Wimbush implies that the officers were there not to assist the nurse in providing medication, but instead to engage in "bad actions." ECF No. 78, p. 3.

on the tier show the officers holding onto Wimbush's arms and Wimbush "skiing" down the tier with one leg held in front and one leg, bent at the knee, in contact with the polished floor.

## Standard of Review

As noted in the previous memorandum, under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial. *See Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249. Further, the court must construe the facts in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *In re Apex Express Corporation*, 190 F.3d 624, 633 (4th Cir. 1999).

A federal court must liberally construe pleadings where, as here, the plaintiff is a self-represented litigant, in order to allow development of potentially meritorious cases. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.

Here, genuine issues exist as to whether defendants applied excessive force in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment, which "'protects inmates from inhumane treatment and conditions while imprisoned.'" *See Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting . . . *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Such Eighth Amendment analysis requires inquiry as to whether prison personnel "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761.

The objective component focuses not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." *Wilkins v. Gaddy*, 591 U.S. ___, 130 S. Ct. 1175, 1179 (2010). The absence of significant injury alone is not dispositive of a claim of excessive force. *Id.* The objective component can be met by "the pain itself," even if the prisoner has no "enduring injury." *Williams*, 77 F.3d at 762 (internal quotation marks omitted). Regarding the subjective component, the key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)[10] (internal quotation marks omitted); *see Iko*, 535 F.3d at 239.

---

[10] In *Whitley*, the Court outlined factors to consider when deciding if the prison official acted wantonly or maliciously: (1) the necessity for the application of force; (2) the relationship between the need for force and the amount of force used; (3) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the

8

Wimbush has established the objective component with regard to his claim, based on Dr. Ottey's report that he suffered chest wall bruising and shortness of breath and Officer Marsh's report indicating Marsh was exposed to Wimbush's blood. ECF No. 33, Attachment C, pp. 8 and 17. What remains at issue is whether Wimbush satisfies the subjective component of his Eighth Amendment claim. The undersigned cannot determine whether the officers deliberately "see-sawed" Wimbush's cuffed arm in retaliation for his lawsuit against Moulden, or whether Wimbush merely failed to comply with the order to stop tugging on the handcuff, in which case the use of pepper spray[11] would not be considered wanton and malicious for the purpose of causing harm.[12] Clearly, Wimbush had acted out repeatedly against corrections staff over a period of two days and it was not unreasonable to conclude that he posed a threat to staff. That earlier misconduct, however, would not, without more, justify automatic use of force based solely on Wimbush's angry demand that he speak to a superior officer to complain about an adjustment ticket. A material factual dispute as to whether defendants overreacted in order to mace Wimbush and deliver a blow as "pay back" for his lawsuit against a prison psychologist remains.

---

responsible officials on the basis of the facts known to them" at the time; and (4) the "efforts made to temper the severity" of the force applied. *Whitley*, 475 U.S. at 321.

[11] Use of pepper spray is not a trivial event. *See Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (observing that pepper spray is designed to disable the person sprayed "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (internal quotation marks omitted)), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[12] Although the video does not provide clarity concerning the incident taking place just outside and inside Wimbush's cell, it does demonstrate how Wimbush was removed from the tier once outside his cell. The video strongly supports a conclusion that after removing Wimbush from his cell, the officers tempered the severity of the force applied and promptly took him for medical treatment. From video taken the previous day, it was apparent that Wimbush was able to walk without a cane with some assistance from escorting officers. In the January 13 incident, however, he chose to go completely limp and place his entire weight on the escorting officers. There is no indication that those officers maliciously dragged him to the medical area in a manner designed to cause injury or dropped him on the floor, and no indication that Wimbush sustained any harm to his lower extremities during this unique "carry" across the floor.

For these reasons, summary judgment shall be denied and Wimbush's requests for counsel shall be granted. A separate order follows.

DATED this 30 day of December, 2013.

BY THE COURT:

/s/ James K. Bredar
James K. Bredar
United States District Judge